## GEORGE B. LYLES v. THE STATE.

1. JUROR.—Though the code does not in express terms make the inability of the jury to speak and understand the language in which the proceedings on the trial are conducted a cause of disqualification, a trial by such a jury is violative of sec. 16, art. 1, of the Bill of Rights.

2. TRIAL BY JURY.—Proceedings in the courts must be conducted in the English language, except in the counties of Nueces, San Patricio, and Refugio, in which the proceedings may be conducted in the Spanish language before justices of the peace, but only when neither the justice of the peace nor the parties are able to write or understand the English language.

3. CHARGE OF COURT.—It is error to charge the jury that "if they believe the defendant killed the deceased without lawful excuse or provocation, but without express malice," they should find him guilty of murder in the second degree. Such a charge excludes from the jury the consideration of the crime of manslaughter.

4. See statement of the case for facts which require the law of manslaughter to be given in charge to the jury:

5. NEW TRIAL.—When there are two jointly indicted and tried, one of whom is acquitted and the other convicted, it is error in the court to refuse a new trial to the party convicted, when his motion is sustained by the affidavit of the party acquitted to facts material to the defense, which, by reason of the joint trial, could not be used in evidence.

APPEAL from El Paso. Tried below before the Hon. S. B. Newcomb.

On the 23d of January, 1874, George B. Lyles was indicted for the murder of José Maria Gamboa. William Brown, Mauricia Lais, Antonio Nieto, Ambrosio Acosta, and Calistra Salis were charged in the same indictment as principals, who were present, aiding and assisting by their acts, &c., in the murder. Brown, Nieto, and Lyles were jointly tried before a jury, nine of whom did not understand the English language, and who were objected to as jurors by the defendants. The charge of the court was written in the English language, and was translated to the jury (orally) by an interpreter; defendants' counsel insisted that it should also be written in Spanish, which the court refused to have done.

The evidence for the State consisted alone of the testimony of Juan Gamboa, a brother of the deceased, who testified that on the 26th of October, 1873, José Maria Gamboa and the witness, both armed, went to where some peons were at work upon a ditch, when the deceased asked them by whose order they were at work. On being told that they worked for Lyles, they were ordered by deceased to desist from work. The same order was given by him to Mauricia Lais, who was making adobes near by. Lais left, avowing that he wanted no trouble, and would see Lyles about the matter. The two brothers then returned to where the peons had ceased work, and awaited the return of Lais, who came with Lyles, Brown, Acosta, and Nieto. As they approached, the brothers rose up, when they were within sixty yards, and stood some ten yards apart. Brown was in advance, and stopped three yards from witness. Lais went to where the peons were at the ditch, while Lyles walked in between the two brothers and stood on the bank of the ditch. This witness stated that, standing thus, Lyles asked the peons who had stopped their work, to which they responded that José Maria Gamboa had stopped them, because he said the land belonged to them; that deceased then said, "Lyles, I did not come here to fight, but to regulate and settle this matter peacefully;" that Lyles made no response, but stood for a moment with his head down; in another instant he raised his gun and fired twice, when deceased fell, after running a short distance, with seventeen bullet holes through his body; that deceased was armed with a rifle, which he carried on account of Indians, but which he did not attempt to use, and which was afterwards picked up uncocked; that when Lyles fired witness was seized by Antonio Nieto from behind, and both arms held, while Brown, in front of him, demanded his pistol, which witness gave to Ambrosio Acosta; that he then ran to his brother, but was outrun by Brown, who took the rifle of deceased.

The witnesses for the defense testified that Lyles had been in possession of the land which gave origin to the difficulty two years; that as early as the 7th of October the deceased, with eight or ten armed men, had gone on Lyles' place and taken forcible possession of corn belonging to Lyles, which was in Nieto's charge. But one witness was examined for the defense who witnessed the homicide, who testified that when Lyles approached the ditch and inquired of the peons who had stopped their work, his gun was resting in the hollow of his left arm, his right hand holding the breech; that when the men responded that José Maria Gamboa had stopped them, deceased raised his rifle as if intending to fire at Lyles, who, turning at the same instant, fired first at deceased, who turned the right shoulder to him as if to dodge, and received the shot in his right shoulder-blade; that at the same time Juan Gamboa attempted to draw his pistol, when he was siezed from behind to prevent its being used; that Lyles cocked his gun when approaching the ditch some twenty paces from it; that deceased cocked his gun when Lyles was sixty yards from the ditch; that the movements of Brown and Nieto were to prevent trouble, and not to make it. This witness testified that Lyles made a crop on the land in controversy in 1873, with the knowledge and without objection from the Gamboas until October 7. The witness Seaton testified that he heard the deceased say that he intended to have the land if he had to take it with his hand on his "sentura." (This is a Mexican provincialism, usually uttered with the action of putting the hand on the side where the pistols are worn.) It was shown that Lyles' character as a peaceable man was good. Brown and Nieto were found by the verdict of the jury "not guilty," and Lyles guilty of murder in the second degree, and his punishment fixed at five years in the penitentiary.

In the motion for new trial, defendant relied, among

other grounds, on the fact that his co-defendants, Brown and Nieto, were material witnesses for him, whose testimony could not be procured on account of the joint trial.    Their affidavits, which accompanied the motion, were to the effect that they went with Lyles from his house to where the peons were at work in the ditch, not knowing when they started that the Gamboas were at the ditch, of which they were told by Lais, who met them; that when within fifty steps of deceased, they saw him raise his rifle, cock it, and put it on the ground again, covering the view of the lock with his leg, and holding the breach of the gun partly between his legs; that the brother, Juan Gamboa, took his position a short distance from his brother and facing him; that Lyles passed between them, holding his gun resting on the left arm, and asked his peons who had stopped their work; that simultaneous with their reply, the deceased answered that he had stopped them, and at the same time raised his gun, the muzzle pointed to one side of Lyles; that at Gamboa's reply, Lyles turned partly around, which brought the muzzle of his gun towards Gamboa, and seeing then Gamboa's position, fired at him.

The instructions had failed to define the offense of manslaughter, the court refused the motion for new trial, and Lyles appealed.

*Coldwell* and *Zabreskie*, for appellant.

*George Clark, Attorney General*, for the State.

DEVINE, ASSOCIATE JUSTICE.—The appellant, George B. Lyles, was indicted, with four others, who were charged at the January term, 1874, in the District Court of El Paso county, as accessories with Lyles in the murder of José Maria Gamboa, on the 27th of October, 1873.    The case being called for trial, one of the parties charged as an accessory was discharged, and the case dismissed as to him.

On the close of the evidence, the court, on motion, directèd the jury to render a verdict of not guilty as to another of the defendants, there being no evidence against him, which was immediately done, and the accused discharged from custody. The jury, after receiving the charge of the court, rendered a verdict of guilty of murder in the second degree against appellant Lyles, and a verdict of not guilty as to the other defendants, William Brown and Antonio Nieto. The court overruled defendant's motion for a new trial, and the cause is now presented for our revision on the grounds set forth in the motion for a new trial, and accompanying affidavits and the exceptions of defendant to the ruling of the court before and during the trial of the cause. So much of the bills of exceptions taken by defendant's counsel will be noticed as are deemed material to the decision of this case. The first bill of exceptions states, "while the jury was being impaneled to try said cause, the counsel for the defendant moved that no one be permitted to act as a juror who did not understand the English language, and the court overruled and refused said motion, and permitted nine jurors to sit upon said cause who did not speak nor understand the English language, to which ruling of the court defendant's counsel objected at the time," &c., &c.

The accused was entitled to a jury to pass upon his case who could understand the proceedings had during the trial. It is scarcely necessary to remark that the proceedings in the courts of Texas are in the English language. No other is allowed. There is no exception, save in the limited authority to use the Spanish language in judicial proceedings before justices of the peace in certain counties west of the Guadalupe river, "when neither the justice of the peace nor the parties are able to write or understand the English language." (Pas. Dig., arts. 1223, 1224.)

It would seem, therefore, a necessity that the jurors should have a reasonable knowledge of the language in

which the proceedings are conducted, to enable them to perform their duties. This necessity becomes of the greatest importance in trials for capital felonies.

The Constitution declares that "The right of trial by jury shall remain inviolate." It cannot be considered as remaining inviolate when the jurors can neither speak nor understand the language in which the proceedings are had. If the trial by jury is to remain a substantial fact and an important right, and is not to be substituted by a legal fiction bearing the name, but wanting in the most important qualification of a jury, namely, the capacity to understand what the pleadings contain, what is said by the counsel in their addresses to the jury, and utterly unable to comprehend the charge of the court, then it is necessary that jurors unable to speak or understand the English language should be excluded from the panel. The code does not, in express terms, make this one of the disabilities of a juror; and the reason would seem to be, that neither the framers of the code nor the Legislature which approved and adopted it supposed it possible that jurors would be forced on a party to try a cause when they could neither speak nor understand the language in which the trial was had—the only language recognized in this State as the language to be used in the district or other courts, save the exceptions cited in this opinion. A trial by such a jury as sat in this case was violative of section 16, article 1, of Bill of Rights of the Constitution, which declares that "No citizen shall be deprived of life, liberty, property, or privileges, outlawed, or exiled, or in any manner disfranchised, except by due course of the law of the land."

In the case of The State v. Marshall, 8 Ala., 302, two persons were called as jurors who, on being questioned as to their qualifications, said, upon oath, they did not understand the English language sufficiently well to serve as jurors. The court set them aside. The defendant's counsel excepted to the action of the court, and, on appeal, it

was held to have been no error on the part of the judge to
direct the jurors "to stand aside," as it was evident they
were not competent jurors—the inability of a juror to
understand or speak the English language being, under
the law of Alabama, as with us, no express ground of chal-
lenge.    The court, in the opinion, declared that it was not
the intention of the framers of the act that the enumerated
causes of challenge should be exclusive of all others, and
that it was evidently not the design of the Legislature to
impair the discretionary power of the court to set aside any
one summoned as a juror who, from any cause, was unfit
to serve as a juror.    We believe a large discretionary
power necessarily exists, and is properly vested in the pre-
siding judge, respecting the admission or rejection of jurors,
but we believe in this case the court erred in overruling
defendant's exceptions to the nine jurors for the want of
knowledge either to speak or understand the English lan-
guage.

The third exception by defendant is, that " The charge
of the court was written in English and translated to the
jury through an interpreter.    Thereupon the defendant's
counsel objected, on account of the charge not being writ-
ten in the Spanish language, that being the only language
which nine (9) of the jurors in said cause could understand,
which motion the court overruled," &c.

However irregular it may be in ordinary cases to permit
translations of the charge to be given to the jury in a for-
eign language, the translation should have been permitted,
in this case, to go to the jury.    Art. 3059, Paschal's Digest,
provides that a written charge shall be delivered to the
jury in all cases of felony; and art. 3066 requires, if the
jury request it, a copy of the charges given shall be taken
by the jury to their room.    Art. 3067 declares that, on the
giving a verbal charge, or a departure from the require-
ments of art. 3066, (among others,) the judgment (on ap-
peal) shall be reversed.

The court, in this case, delivered a written charge in English. It was translated to the jurors by a person stated in the motion for a new trial to be wholly incompetent, and who translated to the jurors the word murder, wherever it occurred, as "assassination." So far as nine of the jurors were concerned, it was, in effect, a verbal charge, and nothing more. The law, in requiring the district judge to deliver his charge, in a trial for felony, in writing, was not alone for the purpose of requiring greater circumspection and deliberation on the part of the presiding judge, or to enable counsel to avail themselves in this court, with greater certainty, of any errors or omissions in it. The right, on the part of the jury, to take a copy of it " with them to their room," when desired, shows that it was also intended to enable them to have the entire charge before them during their deliberations, exactly as delivered by the court, with not a sentence added nor a line erased, so that in all cases of felony the jurors might be relieved from the liability to misconstrue its meaning or mistake its statements. Were they compelled to rely upon their confused recollection as to its terms, contention as to what the charge meant would naturally arise from their imperfect recollection. The refusal of the court to permit the jury to have a copy of the charge translated into Spanish, (doubtless arising from the belief on the part of the court of its not being authorized by law, the practice not prevailing in that or other counties,) left nine of the jury in the condition of jurors who had only received a verbal charge in a case of felony. It left them, in effect, dependent upon the reading or construction which the three jurors who understood English might think proper to give them respecting any portions of the charge not recollected. While such statements by the three jurors may have been correct, it was not, in substance, giving the accused a fair trial by a jury, such as is contemplated by the Constitution and the Criminal Code. The necessity for a translation of the charge

into another language, in this case, illustrates the error of compelling a defendant or the State to accept jurors unable to speak or understand the English language. The court erred in refusing to permit the jury (under the peculiar circumstances of this case) to have a translated copy of the charge.

The second ground of motion for a new trial, "because the court erred in its charge to the jury," is supported by that portion of the charge as follows: "Should you find from the evidence that defendant, Lyles, killed Gamboa without lawful excuse or provocation, but without express malice, you will find him guilty of murder in the second degree." This portion of the charge excluded from the jury the consideration of the crime of manslaughter, and compelled them, if they believed the prisoner guilty of a felonious killing, to find him guilty of murder either in the first or second degree. When the evidence in this case is considered, it is evident that "the law applicable to the case" was not set forth to the jury. The statement of facts shows that the defendant was in possession of the land for two years; that about three weeks before, deceased and his brother came on the land armed, and prevented the agent of defendant from receiving rent-corn from one of defendant's tenants, deceased (Gamboa) claiming the land; that, one day after, deceased and his brother came again on the land, both armed, and with eight or ten peons, (laborers,) and carried off the corn which defendant's tenant had set apart for him. The deceased and brother came again on the land and carried off the rent, consisting of near eighteen bushels of wheat, from another of defendant's tenants. The day on which the homicide took place the deceased and his brother, both armed, came again on the land, compelled several men at work for defendant to quit work, and on defendant's coming from his dwelling to the place where the men had been at work, and inquiring who had stopped their work, de-

ceased replied that he had stopped them, at the same time raising his rifle as if going to fire at defendant. This evidence is contradicted by the brother of deceased. The evidence, taken altogether, however, shows such a condition of affairs and state of mind on the part of the accused as required the judge to instruct the jury on the law of manslaughter. The failure to do so was error.

The fourth ground of the motion for a new trial is based on the refusal of the court to direct the jury to pass, after all the evidence had been given in, upon the cases of William Brown and Antonio Nieto, jointly indicted as accessories with Lyles, with the view of using them as witnesses for defendant, Lyles, in the event of their being acquitted. In this respect we believe the court did not err. Pas. Dig., art. 3054, declares that "When it is apparent that there is no evidence against a defendant  *   *   *   *  jointly indicted with others, the jury may be directed to find a verdict as to such defendant, and if they acquit, he may be introduced as a witness in the case."

In this case, however, there was evidence that tended to implicate Brown and Nieto; and the judge, under the provisions of the Code, was authorized to overrule the motion as made on the trial. The case of Jones v. The State, 13 Tex., 178, relied on by appellant, was a decision rendered before the adoption of the code.

The seventh ground of the motion for a new trial, that the acquittal of William Brown and A. Nieto placed defendant in a condition to introduce evidence on a new trial which it was not in his power to use, by reason of their being jointly indicted with accused, and the affidavits of Brown and Nieto attached to the motion was, we believe, sufficient to warrant the granting of a new trial.

In the case of Jones v. The State, already cited, the court decided, and quote the remark of Chief Justice Savage in the case of The People v. Vermilyea, 7 Cow., 369, that a new trial ought to be granted under such a

state of facts, "not on the ground of newly-discovered evidence, but on the ground that important evidence was now within their power to produce that the rules of law had put beyond their reach on the former trial."

The judgment is therefore reversed and the cause remanded.

REVERSED AND REMANDED.