GEORGE BROWN, JR., AND ANDREW BROWN *v.* THE STATE.

1. CHANGE OF VENUE. — The motion of the defendants for a change of venue having been sustained, and the case sent to D. County for trial, the defendants pleaded to the jurisdiction in D. County, upon the ground that the case should have been sent to C., as the nearest and the adjoining county. *Held*, that the plea to the jurisdiction was properly overruled. The proper time to have excepted was when the order changing the venue to D. County was made. And *held*, that the district judge is authorized to change the venue in a criminal case, of his own motion, to any county within his own or an adjoining district, when he has knowledge of the

existence of such prejudice against defendant in the county where the trial is pending as would deprive him of a fair trial.

2. SAME. — The court acquiring jurisdiction by change of venue has authority to compel the clerk of the court from which the case was removed to supply any deficiencies in his transcript which are requisite to show all the proceedings had in the case before its removal.

3. EVIDENCE. — The competency of witnesses of tender years is confided to the discretion of the court below, and in which such witnesses may be tested; and this court will not revise the action of such court in admitting such evidence, unless it is shown that such discretion has been abused to the prejudice of the defendant.

4. CHARGE OF THE COURT. — A charge, as to its sufficiency or insufficiency, is to be examined by its applicability to the facts adduced in evidence. See state of case wherein no charge was requisite upon the legal effect of the testimony of an accomplice, or on the necessity for its corroboration.

5. ACCOMPLICE. — In all cases where the law treats a witness in the light of an accomplice or *particeps criminis*, there must appear facts or circumstances establishing the fact, or creating a reasonable presumption of guilty complicity.

6. NEW TRIAL — EVIDENCE OF CO-DEFENDANT. — In order to obtain a new trial for the purpose of securing the testimony of an acquitted co-defendant, it must not only appear that the evidence which he can give is important and material, but that it is also legal and competent.

7. SAME — EVIDENCE. — A new trial will not be granted if it appears that the desired evidence is destined to impeach a witness on the former trial; nor yet, unless it reasonably appears that the evidence, if admitted, would probably change the result.

APPEAL from the District Court of Denton. Tried below before the Hon. J. A. CARROLL.

Appellants as principals, and George Brown, Sr., and Jesse Brown as accomplices, were charged by the indictment with the murder of Doc McClain, in Montague County, on May 1, 1876. Appellants and Jesse Brown being tried jointly, Jesse Brown was acquitted, and appellants convicted of murder in the first degree. The case of *Brown* v. *The State*, 3 Texas Ct. App. 294, narrates a similar episode in the career of these appellants.

J. C. Stephens was the first witness introduced by the State. He was acquainted with appellants, and with George Brown, Sr., and Jesse Brown, and remembers that a man

called Doc McClain was killed on Farmer's Creek, in Montague County, in May, 1876, but did not know the man. Witness was justice of the peace of Precinct No. 1, Montague County, and, as such, held an inquest on the body. First saw the body lying on the ground on Farmer's Creek, at a point near what is known as Chestnut Ford crossing. The breast appeared to have been penetrated by twelve or fourteen buckshot. There was also a wound in the side, lower down, and larger than those in the breast; and, in the opinion of witness, it was made by a pistol-ball.

About twenty steps west and north from where the body lay, there was a bank or ravine. The ravine appeared to have been washed out on the side, the wash making a kind of second bank, which was some two or three feet from the top of the first bank. Witness thought that he could detect dim tracks, which looked like some one had stood there. The tops of some bushes had been broken off. Witness first saw the body on Sunday morning, at which time it appeared to have laid there a day or so. The body was buried near where it was found.

Cross-examined, the witness says that Mr. Sloss, Mr. Coffelt, Huse Robinson, Jesse and George Brown, Jr., were at the inquest. Others were there, whom witness does not remember, but does not think that Andrew Brown was there. Witness heard Jesse Brown, one of the defendants, say that morning that he saw three strangers passing through that country the day that McClain was killed, and that he expected they were the men who did the killing. Witness was not acquainted with the deceased in his lifetime; did not know, of his own personal knowledge, that the body over which he held the inquest was that of Doc McClain; only knows that such was the name by which he was called by the people on the ground.

The body was lying about twenty feet from the ravine, and a person could stand on the second bank of the ravine and see it easily, where it was lying on the ground. It lay

in an easterly and southern direction from where the wash-out was. There was no road or path passing by the body, but there was a road that crossed Farmer's Creek at the Chestnut crossing, which ran north and south. This road was about two hundred and fifty yards east from the body. There was also a small ravine, which emptied into Farmer's Creek, running between where the body was found and the road. The body lay on that side of the ravine opposite from the road, and there was scattering timber and brush along the ravine. From a point two hundred and fifty yards from the body, in an east and south direction, the place where the grave was made can be seen; that is, a person at that point on the road could see a person at the grave, but could not recognize a person there by his features. A person standing on the second bank in the wash-out could see a person in the road very well, and a person standing in the ravine on the second bank, and holding up a hat, could be partially seen from the road; or, more properly, the hat and about a foot of the arm could be seen from the road. When the arm and hat are taken down, the person could not be seen from the road. A person on the road could just tell that there was some thing in the wash-out, but could not see much. Mr. Jamison, one of the counsel, got witness to go with him and take a view of the ground. Jamison held up his hat on the second bank, and witness saw it and his arm down to about the elbow, from the road. John Southerland was at the inquest, and got down into the grave and laid down, as he said, to measure it before deceased was put in.

There were two trees on the east side of the road, at a point about two hundred and fifty yards from where the body lay, in a direction somewhat south from east from the body. After passing fifty or sixty yards along the road towards the crossing, from these trees, a person on the road could not see the place where the grave was made, on account of the timber and brush, until a point was reached

near the ford, some three hundred yards north from the trees spoken of, and on the right of the road.

Upon his reëxamination by the State, the witness stated that, when he went to view the ground with the defendants' attorney, he did not go to the ravine where the body lay, but remained on the road near the trees, where John Southerland told him he was standing when he saw the deceased killed. The attorney spoken of went down into the ravine and held up his hat, which witness could distinctly see while held up, together with that part of the arm up to the elbow. Does not know of his own knowledge, but was told by the attorney, that he stood on the second bank in the ravine, where the tracks were seen. The attorney may have been down in the ravine, and not on the second bank, though he told witness that he stood on the second bank. Witness did not go to the ravine that day. A person could be seen at the grave from where witness stood on the road, but witness does not think that the person could be recognized, — not by himself, at least, as his eyesight is not good.

John Young Southerland was the next witness who testified for the State. Had resided on Farmer's Creek, Montague County, two years the past fall. Was not personally acquainted with the deceased, but knows that he was killed on or about the nineteeth day of May, 1876, by shooting. Witness saw the deceased just before he was killed; saw him killed, and saw him just after he was killed. Saw him walking along about one hundred yards, before he was shot. Witness had started out that morning to hunt a pony, and was on the road near Chestnut Ford, when he saw deceased coming across a small prairie, about two hundred yards off. He was going in the direction of a small ravine, near where he was killed. In a few minutes after witness saw deceased, he saw George Brown, Jr., Andrew Brown, and Sampson Barras cross the road and pass out of sight into the ravine. Witness had dismounted to fasten his saddle, and was

watching the deceased, to see or ascertain who he was. Deceased had walked about one hundred yards from where witness first saw him, and when he had reached a point about twenty steps distant from the ravine, witness saw Andrew and George Brown, Jr., Sampson Barras, and a man whom witness afterwards found out to be John Barras, rise up from behind a bank and shoot the deceased. Deceased fell, when George Brown, Jr., ran out, shot him with a pistol, and ran back into the ravine.

The four parties who rose up and shot had shot-guns. When the deceased was shot, he fell, and made a noise as though he was in agony. The witness did not see John Barras go into the ravine; does not know how he got there, as the first he saw of him was when he got up to shoot. Witness was not acquainted with John Barras. The first that witness saw of Andrew Brown and Sampson Barras, they were armed; the first riding a dun pony, Sampson Barras a bay mule, and George Brown, Jr., a brown mule. When witness saw deceased, and afterwards saw the Browns and Barras armed, he thought some thing was going to be done. Thinks that the deceased must have walked about one hundred yards from where he first saw him to the place where he was killed. When the parties killed deceased, witness left the vicinity as fast as he could, going first to Mr. Adams's house, and then to Mr. Glaze's, and from there home.

Witness had a conversation with George Brown, Jr., a few days before the killing, in which said Brown told witness that there was a bad set over at Johnson's, and that they were going over there "to get away with them." The deceased lived at Johnson's. Witness also had a conversation with the defendant Jesse Brown, at the school-house, the day after the killing, in which he asked witness, "Has George Brown (meaning his brother, George Brown, Jr., defendant) got you under good control?" Witness responded that he didn't know; and Jesse Brown then said

that he wanted witness to go over there where the inquest was held, and tell those people that he (witness) saw three men from the Indian Nation, on the day of the killing, hunting for deceased, and that he (witness) expected they "got away" with deceased.

From the place on the road where witness stood, the shooting could be seen very plainly. The witness saw the four men, when they rose up to shoot, plainly down to the waist. There was a kind of wash-out, or second bank, to the ravine, and they stood on this second bank when they shot the deceased; and witness knows that they were Andrew and George Brown, Jr., and Sampson and John Barras, and knows that they did the shooting. Witness was standing on the road, near a large tree, and could see the parties plainly, and was close enough to recognize them.

Witness knew the mules that were ridden by Sampson Barras and George Brown, Jr., and also the dun pony ridden by Andrew Brown. Witness has examined the ground about the place where the killing took place, and says that a person standing where he stood can see a person standing on the second bank, from the waist up, and can easily recognize the person, there being no brush or timber in the way. There is, however, some brush and timber that would be in the way if a person were standing in the road some distance either above or below where the witness stood when he saw the parties named kill the deceased.

Being cross-examined by the defence, witness stated that he moved from Stephens County, where he went when he was about three years old, to Young County; from Young to Throckmorton County; from Throckmorton to Stephens County; from Stephens to Grayson County; from Grayson to Throckmorton County; and from Throckmorton to Montague County. Witness had not been living in Montague County long when the killing took place, but had been there, off and on, for some time. Witness had a brother living on Farmer's Creek at the time he came back to Montague

from Grayson County, where he had been on business, the Sunday before the killing took place. Witness was out hunting a pony that ran in the neighborhood where the killing took place. He had not seen the pony for a year, but had been told that he was still in the neighborhood, and he had seen the pony himself a week or two before this. Had not been staying in Montague County much for four or five months previous to the killing. Was about two hundred or two hundred and fifty yards distant when the guns fired that killed the deceased. Was in the road that crossed Farmer's Creek at Chestnut Ford crossing.

Witness was near two trees that stood to the east of the road as it approached the creek, and could see down to the crossing. After the killing, witness went up the road to Mr. Adams's, and thinks that he told Mr. Adams that he was hunting a pony, but did not tell him about seeing a man killed. From there witness went to Mr. Glaze's, and from there home. Witness, with his brother, was within fifty yards of the dead body the day after the killing. Did not tell his brother about the killing. The two — witness and brother — were on their way to Salt Creek, to hunt cattle. Witness observed the deceased, on the day he was killed, while he walked about one hundred yards. Had seen him before he got off his horse to fasten his saddle, and was noticing him to see if he could tell who he was ; and watched him the closer after he saw the defendants and the Barrases go into the ravine, about seventy-five or a hundred yards from him. The witness had never seen the deceased before that day. Four shots were fired at deceased from guns, and one shot was fired with what witness took to be a pistol, by George Brown, Jr., when he came up on the bank.

Witness had been back to Montague County a few days when the killing occurred, and had never lived there permanently, though he had stayed there several months at a time, and had often passed in and out of the county. Had been in Cooke County a part of last year, and had lived in Gray-

son County. Had often been in the city of Sherman, but had never gone there to stay any length of time. Went to Sherman once and stayed three or four days, at which time he bunked at nights in the wagon-yard. Never went there at any other time to stay that long. Was taken to Sherman once and placed in jail, which was not the time he bunked in the wagon-yard. Stayed this time about three weeks. Witness and another young man were put in jail on a complaint of penning cattle. The cattle belonged to the young man's great-aunt, and she had authorized him to pen the cattle; and as soon as she came to Sherman, witness and the young man were released.

Witness had the conversation with Jesse Brown in regard to the men from the Nation, at the school-house, on the day that deceased was found. Allen, the crippled school-teacher, who boarded with Jesse Brown, was present at the conversation, in which witness was directed what to say about seeing three men from the Nation hunting the deceased; and it was in the same conversation that Jesse Brown asked witness if George Brown, Jr., had him under pretty good control. Allen, who heard the conversation, has fled the country. Witness did not tell of the killing, or what he knew about it, until after the Browns were arrested; and his reason for not doing so was, that he was afraid of the Browns and their friends. Witness believed they would kill him if he told what he knew, and believed they had killed others for telling what they knew, and would not hesitate to kill him the same way. Witness thought himself the only witness to the killing, and was afraid that his testimony alone was not sufficient to convict the Browns, and was consequently afraid to tell what he knew, until they were arrested, and he had found out that there were other witnesses to corroborate him. The reason witness thought some one was going to be killed the morning he saw the Browns and Barrases was, that George Brown, before that, had told him that there was a " hard lot

at Johnson's," and that they were going to "get away with them;" and, seeing the three armed, witness thought they were now going on some business of that kind. Witness did not decoy the deceased to the place where he was killed, and did not know that he was going to be killed. Witness had stopped in the road to fix his saddle-blanket, when he saw the appellants cross the road and enter the ravine, as stated. Did not know where they had gone to, until they ran up and shot the deceased. Witness saw the deceased before he saw the appellants, and scarcely took his eyes off his person until he was shot. Did not know him, had never seen him before, and saw him that time only as he walked about one hundred yards.

On reëxamination, witness stated that he was taken from the Sherman jail on *habeas corpus*. The aunt of the young man who was in jail with witness had sent them to gather some stock which belonged to her, near Denison. Witness and the young man were arrested upon the complaint of the man who was looking after the cattle, and they had to stay in jail until the aunt came to testify that she had sent them. As soon as she came they were released, and never indicted.

Alvin Adams, for the State, testified that he lived in Montague County, near Eagle Point, but formerly lived near where all the Browns lived, and knows Andrew, George, and Jesse Brown, Sampson and John Barras. Witness and his brother Blake went to school to Ed Robertson on the day of the killing. On that morning he saw George and Andrew Brown going in the direction of Chestnut Ford crossing, and saw John and Sampson Barras with them at the time. They were riding, but witness does not recollect what they were riding. Thinks some of them were riding old man Brown's mules. Witness saw these men about eight o'clock, A. M. Does not know whether or not they were armed. When witness first saw them they were crossing the road; did not stop at the branch. Wit-

ness knows all old man Brown's horses, but does not recollect whether or not any of them were ridden by the party. Witness is now ten years old, and says that all of this transpired about two years ago.

Cross-examined, witness said that himself and his brother Blake were going to school to Ed Robertson, who was boarding with Jesse Brown. Did not see John Southerland that morning. The parties were going in the direction of the Chestnut Ford crossing, and were then about one mile from the crossing, travelling the road that led to Wallace's, — not the same that led to the school-house. Witness has talked to Mr. Matlock, the county attorney, about what he would swear on this trial. Witness's mother told him the time of day before he started to school. Witness does not recollect whether or not Mollie Addington was at school that day. Learned of the killing from his father, on Friday, whom he heard talking about it. The county attorney, Mr. Matlock, had talked to witness about the case the last term of the court, and told him what he would ask him. Another man talked to witness during this term of the court, but witness does not know him. Witness does not know whether or not he knows John Barras, but does know Sam Barras.

George Howard, for the State, testified that he was a resident of Montague County when deceased was killed. He lived on Farmer's Creek, and thinks the killing took place on a Friday morning, some time in May, 1876. Witness was working for Jesse Brown on his farm, and had a conversation with him, just before the killing, about some of his (witness's) horses that had been stolen. Brown said that he expected that Johnson and deceased had stolen them, and that they would have to be killed. This was all that defendant Jesse Brown said at that time. Witness had a subsequent conversation with Jesse Brown, after the killing, in which he told witness that he guessed a party from the Nation had killed deceased; that he had sent word to

them to come and get their thieves, and he guessed they had got them. Witness lived near Jesse Brown's, and was in his field the morning of the killing. Saw George Brown, Jr., going around his field, towards home, between ten and twelve o'clock. He was then riding old man Brown's brown mule, in a lope. Witness hallooed to him, but he did not stop, nor look towards him. He had his hat pulled down over his eyes.

Cross-examined, the witness said that the killing took place in the spring of the year 1876. Witness was hoeing cotton. Did not know deceased; and the conversations with Jesse Brown took place before he was arrested. George Brown was alone when he passed the back of witness's farm, and had no gun.

Joe Collier was the next witness introduced for the State. He knew deceased, and had first known him in Grayson County. Knew him in Montague County before he was killed. Witness had a conversation with Jesse Brown, after the killing, about a certain note he had received, warning him to leave the country. Witness asked Brown if he knew any thing about it, to which Brown answered that he did not, and that if any body attempted to injure witness, he would stand by witness, — that they " hung up such men as that." Witness then asked him if he knew who killed the deceased; to which he replied that he supposed deceased was a thief, and that some one had followed him from the Nation, and " got away with him;" that he sent them word to come and get their thieves, and he supposed they had done so. Witness then said to Brown, that if deceased was a thief, then his brother John (witness's brother) was a thief, and asked why, if they killed deceased, they didn't kill John Collier also; to which Brown answered, "Joe, you know you and I have been friends, and your brother John was a young fellow. I sent him word to get out of the country, to keep from being killed, as he was young, and there was a chance to reform him if he was a thief." On cross-examination,

witness says that Brown did not say he knew who killed deceased.

John Collier next testified for the State. Was acquainted with the Browns. Lived in Montague County when the deceased was killed. Knew deceased well, who was his partner. The two were living, at the time, at Mr. Johnson's. Witness had not seen deceased for a long time, — not since "just a little while before he was killed." Witness and deceased started out together early on the fatal Friday, to hunt their ponies, separating shortly and going different ways, since which time witness has not seen deceased. Witness was uneasy about deceased, and fruitlessly hunted for him. On the Saturday morning following the killing, witness saw the defendants at work on an arbor at the school-house. Told them that deceased was missing, and asked them to help hunt for him. Witness also told them that he was afraid some thing had happened to deceased, though he did not know that deceased had any enemies. To this Jesse Brown replied that deceased had more enemies than witness knew of. Jesse and some of the other parties went with witness towards the body. After separating from deceased on the morning of the killing, witness heard some shooting from the direction where the body was found. Witness could not tell how many shots were fired, the firing "going like popping whips." One shot was fired after the first volley.

About ten o'clock on the same morning, before witness had got in from hunting the ponies, he was standing in a cow-patch talking to a Mexican, who was trying to sell him a pistol, when George Brown rode up and asked witness, "Where is Doc?" He was looking so pale and agitated that witness asked him what was the matter, — if he was sick. He said that he was not sick then, but had just had a very severe attack of colic. Defendant was riding old man Brown's brown mule. He then looked at the Mexican's pistol, and said, "Let me show you a pistol that is a

pistol," — suiting his words by pulling out his pistol and showing it to the Mexican. The Mexican remarked that there was a load out of it; to which defendant responded that, as he was always shooting at rabbits, he could not keep it always loaded. It was a large six-shooter, and chambered a 44 cartridge. The defendant George Brown came up to witness on the cattle-trail, a short time after the shooting spoken of, and was not travelling the road. On Saturday, when Jesse Brown, John Barras, and others left the arbor to hunt the deceased, and after they had gone some distance, John Barras took witness off to one side, gave him $2, and told him to leave the country at once, or he would be killed too. Witness left accordingly, and has not seen deceased since, dead or alive.

Cross-examined, the witness says that when he saw George Brown on the Friday morning, it was after the shooting which he heard, and about nine or ten o'clock in the morning. He was not in the road when he came up to where witness was. Brown might have been trading pistols with the Mexican. The Mexican and others were with a drove of cattle. Witness did not see deceased after he was killed.

Joseph Sloss, for the State, testified that he was present at the inquest, and saw the body of the deceased, which lay about twenty-two steps from a ravine on Farmer's Creek, in Montague County. There was some paper found near the ravine, between the bank and where the body lay, about five or six steps from the bank towards the body, and it had the appearance of having been used for gun-wadding, and looked powder-burnt. There had been some rain the night before, and but a few dim tracks could be seen on the second bank down in the ravine. Witness got down on the second bank spoken of, and could distinctly see the body of the deceased where it lay. The bank was about waist-high. Witness could stand on the second bank and see and recognize a man standing near the two trees on the road, where John

Southerland said he was standing when he witnessed the murder. Witness also stood in the road where Southerland stood, and could see and recognize a man standing on the second bank described, from which point the man could be seen from the waist up. Witness, with several others, examined the ground on the morning the inquest was held; and also went, in company with Mr. Coffett, John Southerland, Huse Robinson, Mr. Starkey, and others, about three weeks ago, and examined the grounds. There is no difficulty in seeing a man standing on the second bank of the ravine from the position occupied by Southerland. There is no obstruction in the way.

On cross-examination, witness said that he did not, of his own knowledge, know that the body was that of Doc Mc-Clain, but there were parties on the ground who were acquainted with him, and recognized him.

J. C. Coffett, testifying for the State, says that he was present at the inquest over the body of deceased. Witness examined the surrounding country, and saw the paper found between the bank of the ravine and the body of the deceased. The wash-out, or second bank of the ravine, was about waist-high to a man. It was quite possible to recognize a man standing there, from the point on the road where Southerland stood when the murder was committed. Witness stood on the road at that point, and distinctly saw and recognized Mr. Starkey and John Southerland.

Cross-examined by the defence, the witness swears, to the best of his belief, that it was Starkey and John Southerland who stood on the second bank described, when witness saw and recognized them from the road. Witness could plainly see the parties from the waist up. There was some grass growing near the bank. Witness could see to the very edge of the top bank. Saw them step up out of the second bank, out on the top bank, and then he could see them down to the soles of their boots. Could not see the boot-soles, but could see down to them. Does not know

whether they had their pants in their boots or not. The bank, from its looks, may have been washed out a hundred years ago. Witness last made an examination of these grounds two weeks ago, with Mr. Sloss, Robinson, Starkey, Southerland, and others. The last two gentlemen are in attendance upon this court. Witness repeats that he could recognize a man on the second bank of the ravine from the point in the road described. Did do so himself in the instance stated, and saw the hair and eyes from the road.

William Adams, sworn for the State, deposed that he is a resident of Montague County. His little son, Alvin Adams, was going to school when deceased was killed, and is a witness here. Witness is acquainted with defendants, and lives about one-half mile from them. John Southerland came to witness's house on the morning of the killing, about ten o'clock, and had no business, that witness knows of.

On cross-examination, does not remember that Southerland said any thing about hunting his pony, but he may have done so. Witness only remembers that they passed, and spoke a few words, when Southerland went on.

John Collier, recalled for the State, testified that he knew John Barras. They were friends, and had been acquainted about two years. He came to witness, and told witness that he had better leave the country; and gave witness $2 to leave on, — all the money he had. State rested.

Frank Willis, sworn for the defendants, testified that he is an attorney-at-law, residing at Montague, and that he knows and is familiar with the locality known as the Chestnut Ford crossing of Farmer's Creek, and also the locality where the grave of the deceased is. Witness stood on the second bank of the wash-out while Messrs. Hardy and Hamil tried the locality from different points of view on the road, about two hundred and fifty yards distant. Witness was on the bank, or slide, — a kind of second bank, — and could see the two gentlemen named, very plainly, on the

road.    The grave is about twenty steps south and east from the wash-out, or ravine, and the road that crosses at the Chestnut crossing runs about two hundred and fifty yards from the ravine, near where the grave is. There is no other road near the place.

On cross-examination, witness says that while standing on the second bank he could see the grave, the bank striking him about the waist.    Could see and recognize the parties on the road from where he stood on the second bank. There was nothing to obstruct the view, if a person were standing near the tree where Southerland says he stood.

S. H. Hamil testified, for the defence, that he lives on Farmer's Creek, Montague County, near the Chestnut Ford crossing, and has at various times examined the locality where deceased was killed.    The grave of deceased is about twenty steps from where the parties stood who killed him.    The road leading to Chestnut Ford crossing runs about two hundred and fifty yards from the grave.    Witness has stood in the road where Southerland says he stood when he saw the killing, and looked down to the ravine where he said the defendants stood when they shot deceased, and could not recognize a man standing on the second bank. Witness could only tell that there was some thing there, but could very plainly see a man standing on the top bank, and could not recognize him unless he knew who it was that had gone there.    Could tell it was a man, but could tell no more.    Witness knows John Young Southerland, and has known him about two years.    He stands about as well as any young man in the community.    Knows nothing against his character.

Huse Robinson, for the defence, testified that he had examined the grounds in the vicinity of the grave of deceased twice, — once in company with Mr. Jamieson, defendant's attorney, and J. C. Stephens, Esq.    Witness and Stephens stood where Southerland said he stood, and Mr. Jamieson went down, as he said, to stand on the second

bank of the ravine, where the murderers stood. Witness could not see him in the ravine until he held up his hat. Could see the hat and a portion of the arm. Could see him "all over" when he got out on top of the bank.

Witness afterwards went to examine the grounds in company with Sloss, Coffett, Starkey, and others. Witness stood in the road, and could then recognize the parties standing on the second bank; could see them from the waist up.

Witness, being cross-examined by the State, does not know that Mr. Jamieson, the defendants' attorney, stood on the second bank; he said he did. He may have been standing at the bottom of the ravine. Witness did not go down to the ravine when he visited the vicinity with Mr. Jamieson. When witness went the next time, with Sloss and others, he stood on both the road and the second bank, and tried the view both ways. Standing on the road at the point where Southerland stood, a man could be seen and recognized who stood on the second bank of the ravine, which would allow all from the waist up to be seen. If the man should stand on the top bank he could be entirely seen. The bank is about three feet high. The view taken by witness the second time was very different from that taken with Mr. Jamieson.

T. C. Pembroke was next introduced for the defence. He went with Mr. Hardy, one of the attorneys for defendants, to take an observation of the grounds where deceased was killed. Witness took several views, from several different standpoints, on the road leading to the Chestnut Ford crossing. Mr. Hardy was down at the ravine. Witness discovered that from several different points on the road the view is obstructed by timber and brush along the ravine. Does not remember two oak trees standing near the road. At one place on the road, some two hundred and fifty or three hundred yards from the grave, there is an opening, and one can get an unobstructed view from there.

Mr. Hardy went down into the ravine, and said he stood on the second bank. He had his wife with him. Witness looked down there, and could see no one until he held up his hat, which he could see, together with a part of his arm. Could see him plainly when he was on top of the bank. A person can see the grave from one place in the road, and from only one, which is near the elm trees.

Cross-examined, the witness says that he did not go down to the grave; was never there, nor at the ravine, or the second bank. Only rode up and down the road from the elm trees to Chestnut Ford crossing, taking observations. Mr. Hardy and wife went to the ravine, but witness does not know whether Hardy stood on the second bank or in the ravine itself. He (Hardy) is of counsel for the defence, and is in court.

Defendants next introduced Mrs. Elizabeth Brown, who testified that she lived in Montague County, and is the mother of George, Andrew, and Jesse Brown, and is fifty-eight years old. Remembers the day on which deceased was killed. George Brown, Jr., lives at witness's house, and on that day was ploughing in the field. Witness saw him in the field that morning, about eight or nine o'clock. He went to work tolerably early; was not away before going to work, nor gone from the house or field before ten o'clock. Defendant had no gun with him that day; if he had left with a gun, witness would have seen it. Andrew Brown came to the house early that morning, and was in the house until noon. He did not go away from the house from the time he came that morning until that time, because witness knows he was fixing his boots all that time in the house.

Witness, being cross-examined, knows Sampson Barras, who is her son-in-law. Witness's husband had a black and a sorrel mule, but did not own a yellow mare. Andrew Brown owned a yellow mare, and rode her from his house to witness's house that morning. Martha Shockley, witness's granddaughter, rode the mare back down to Andrew

Brown's that morning.   Andrew's wife then came over to witness's house, and was there all day.   Witness saw her son, the defendant George, Jr., ploughing the black mare in the field all day on the Friday of the killing.   Does not know where the sorrel mule was that day.   George Brown, Jr., was hired to witness's husband, and was ploughing the black mule on the day before the killing.   Sometimes he watered his plough-stock at the creek, and sometimes at the spring. The creek is about one mile from the house.   Sometimes George Brown, Jr., took the mule to water, and sometimes witness's grandson took it.   The old man went over to Gus Johnson's that evening to get his corn-drill, going about two hours by sun.

Bettie Brown, wife of defendant Andrew Brown, testified that Andrew stayed at home in his own house all night, the night before the deceased was killed.   He was there next morning, and went nowhere until he went to his father's to help fix the fence, which was about eight o'clock. On that Friday morning he was at old man Brown's house, soon after he left home.   Witness followed him speedily to old man Brown's, and when she got there he was mending his bridle; and he did not go away from the place that day. Witness saw George Brown, Jr., working there in the field through the day, where she went occasionally to see him. Witness and her husband live about one and a half miles from old man Brown's, and she reached the latter's house between eight and nine o'clock on that day.   Andrew did not leave the house at all until noon, when he went and assisted his father in fixing his fence.   Sampson Barras stayed at witness's house the night before the killing, and was riding old man Brown's sorrel mule.   Defendant Andrew Brown owned a shot-gun, but did not take it away with him that morning.   Witness saw the gun under the head of the bed that morning after Andrew had left, when she was sweeping and cleaning up.

Cross-examined, witness knows that the killing was done

on Friday, because it was on the next day that the men met at the school-house to fix the arbor for camp-meeting, and that was on Saturday. Remembers that Rat Morrow was killed, but does not remember the day, month, or year. Thinks that Andrew Brown went to town on the day after Rat Morrow was killed. Does not know where he was when Morrow was killed, but was at home when Freeman Batchelor was killed. Old man Brown worked in the clearing all day, until just about dark. Witness saw him in the clearing all day, making a fence, and Andrew was with him. About dark the old man came home, had supper, and after talking awhile they all went to bed. Witness is as certain that the old man stayed in the clearing all day, until about dark, as she is about any thing she has sworn in the case. Andrew and Jesse Brown were not on good terms at the time of the killing of deceased, and had not spoken to each other for a year before that event, and did not speak to each other until after they were arrested upon this charge. Witness is certain her husband did not take his gun away that day, because she recollects distinctly that, after her husband left, her little brother took the gun out and discharged one barrel, which was the first time he had ever discharged a gun in his life.

Nannie Hart, testifying for the defence, says that she was at Andrew Brown's house on the Thursday night before the killing of the deceased. Andrew was at home all that night, and he was there next morning. Witness saw him when he started to go to old man Brown's, which was at about eight or nine o'clock. Witness's mother started her, with instructions to catch up with him if she could, to get him to come back and sew up a wound on her pony, which had got hurt; and if she could not catch up with him before he got to the old man's, to bring the old man back for that purpose. Witness could see Andrew along the road all the time, but could not catch up with him. Saw him hitch his pony and go into the house. The old man was working in

the clearing near the house, and witness told him what she wanted. He then went into the house, came over, fixed the pony's leg, and stayed till near noon, and then went back. Witness saw George Brown in the field, ploughing the old man's mule; and knows that Andrew's gun was at home.

Cross-examined, the witness says that she knows that the gun was at home after Andrew left, for she saw it. Remembers it well, for her little brother, twelve years old, took it out to hunt with, and shot it off, — the first time he had ever shot a gun. Witness was up early that morning, intending to go to wash, but did not get off. The gun was under the head of the bed. When witness got back from the old man's that morning, the house was cleaned up. Witness did not do up the housework. Witness was milking that morning when Andrew rode off on his yellow, or dun-colored pony. Sampson Barras lived at old man Brown's. He stayed all night at Andrew Brown's on Thursday night.

Josie Shockley, testifying for the defence, says that she lives in Montague County, one-half mile west from old man Brown's, and one-half mile east from where Andrew Brown lived. Remembers the time of the camp-meeting, in 1876, when it was at the school-house, and about the time that deceased was missed. On that Friday morning witness saw Andrew Brown riding past her house, going towards his father's, and remembers that he had no gun. It was early in the morning, — about eight o'clock. Witness went down to his father's a few minutes after he had passed, and found him there in the house. Witness stayed there until about noon, helping to churn; and when she left, Andrew was still there. Witness saw George Brown, Jr., working in the field when she went to old man Brown's that morning. Neither of the boys went away from the place that day, while witness was there, with guns or any thing else.

Defendant closed.

No brief for the appellant.

*George McCormick*, Attorney-General, for the State. The court did not err in changing the venue to Denton County. *Preston* v. *The State*, 4 Texas Ct. App. 191. The district judge has authority to require district clerks to perfect their transcripts in emergencies of this character; and, again, it is not shown that the order in this case worked a hardship, or that the error complained of was material. Pasc. Dig., art. 3137. See *Ake* v. *The State*, *post*, p. 398, for rules governing the competency of youthful witnesses. On charge of the court, see *Brown* v. *The State*, 4 Texas Ct. App. 275. The statement of a witness that he was not engaged in the crime will not relieve his testimony from the brand of the law. *Carroll* v. *The State*, 4 Texas Ct. App. 117; *Kelly* v. *The State*, 1 Texas Ct. App. 627. See also *Davis* v. *The State*, 2 Texas Ct. App. 588. In this case, the only intimation of witness's connection with the crime comes from the manner of his cross-examination, which should not, of itself, raise a presumption against him. The newly discovered evidence was not important enough to authorize a new trial. On materiality, etc., see *Huebner* v. *The State*, 3 Texas Ct. App. 458, and cases cited. The affidavit of the witness Brown does not show facts which would authorize a new trial, first, because the evidence is sought to contradict a witness (*Terry* v. *The State*, 3 Texas Ct. App. 239; *Hauck* v. *The State*, 1 Texas Ct. App. 357); and, second, the facts stated in the affidavit do not reasonably show that such proof would probably change the result on another trial. *West* v. *The State*, 2 Texas Ct. App. 209, and cases cited.

WHITE, J. The appellants in this case were jointly indicted, as principals, in the District Court of Montague County, for the murder of one Doc McClain, which murder was alleged to have been committed by them on the first

day of May, 1876.    George Brown, Sr., and Jessie Brown
were also indicted with appellants, but they were charged
with being accomplices to the murder, who were not present
when it was committed, but who, prior to its commission,
advised, commanded, and encouraged the others in its com-
mission, and prepared arms and aid for the purpose of
assisting the principals in the execution of the deed.    Pasc.
Dig., art. 1814.

A motion was made to quash the indictment, which was
overruled by the court, as we think, correctly, none of the
objections urged in the motion being well taken.    On the
eleventh day of June, 1877, all the defendants united in an
application for a change of venue, setting forth the usual
statutory, and certain other special grounds, and their motion
was accompanied by the supporting affidavits of eleven
resident citizens of Montague County.    This motion was
granted, and the court ordered the venue changed and the
cause transferred to the District Court of Denton County.
At the February term of the District Court of Denton
County, 1878, the appellants, George Brown, Jr., and An-
drew Brown, pleaded to the jurisdiction of the court, the
plea being based upon the ground that, the application for
change of venue having been granted upon their motion,
the cause should have been transferred for trial to Clay
County, which was the next adjoining county whose court-
house was nearest to the court-house of Montague County,
and the one to which the law in such cases required that it
should have been sent.    Pasc. Dig., art. 2998.

This plea was overruled, and the two appellants and
Jesse Brown, one of the accomplices, were placed upon
their trial, they having been duly arraigned, and their plea
of not guilty having been entered in Montague County
before the venue of the cause was changed.    The result
of the trial was that appellants were found guilty of mur-
der in the first degree, with the death penalty assessed,
and Jesse Brown, the accomplice, was found not guilty, and

acquitted. It is from the judgment of conviction that these two appellants bring their case here, and ask its reversal. We regret that the counsel who defended with such skill and ability on the trial below have not appeared in this court, to aid us, by oral argument or brief, in solving the several interesting questions raised by them and presented in the record. These questions are contained and formulated in an assignment of errors attached to the transcript.

The first error noted in the assignment grew out of the motion to quash the indictment, which we have already held was sufficient, and the objections untenable.

The second and third errors can be treated together, since they relate to the same subject-matter, viz., the action of the court in changing the venue to Denton County, and overruling the plea to the jurisdiction predicated upon that action. In the bill of exceptions reserved by the defendants to the ruling on the plea to the jurisdiction, the court explains, in full, the reasons which induced the transfer of the case to Denton County ; and we find the same reasons embodied in the judgment overruling defendant's plea to the jurisdiction. No essential difference is perceived in the point as here raised and that made in Preston's case, except that in Preston's case the defendant, in his application for the change of venue, expressly requested that the cause should be transferred to Clay County. In that case the action of the court was sustained, under the general authority conferred by the first section of the act of 1876 (Gen. Laws 15th Leg., p. 274) on the district judge presiding, upon his own motion to order a change of venue to any county in his own or in an adjoining district, when he had become satisfied that a trial alike fair and impartial to the accused and the State could not, from any cause, be had in the county where the cause was pending. It was further held in that case that the defendant should have excepted to the order in the court at the time it was made. *Preston* v. *The State*, 4 Texas Ct. App.

186.   No bill of exceptions was saved at the time the court in this case changed the venue to Denton County.   In our opinion, the court did not err in overruling defendant's plea to the jurisdiction.

The fourth, fifth, and sixth errors assigned may also be treated and considered together, as growing out of the same order of the District Court granting a writ of *certiorari* to the clerk of Montague County to make out and send up a complete and perfect record of the proceedings had in his court prior to the change of venue.   It is said that a suggestion of a diminution of the record, and the awarding of a *certiorari* for such purpose is unknown in the practice in the District Court.   Technically speaking, this may be so.   Still, the judge had the right to have a correct transcript of all the proce￮dings sent with the papers in the record to Denton Coun·y, in order that he might be advised, and that it might appear in the court where the case was finally tried, what steps and proceedings had been taken from its very inception to its close ; and he had the right to issue any order necessary to compel the district clerk of Montague County to supply any deficiencies in his transcript which were required to make understood all the previous proceedings. Further than a mere technical objection to this order of the court, we are not informed, by bill of exceptions or otherwise, what is complained of ; or where, how, or in what respect the defendants could possibly be injured by having the transcript from Montague County speak the truth by being made complete.

Admission of the testimony of the ten-year-old boy, Alvin Adams, is the seventh error assigned.   In the bill of exceptions saved to the admission of the testimony, the preliminary examination of the boy by the court as to his knowledge of the obligations of an oath is detailed, and we are unable to perceive that the court erred in permitting the child to testify.   It was the province of the court to satisfy

himself of the intelligence and competency of the witness; and, being a matter purely within his discretion, his action in admitting the testimony will not be revised, unless it is made clearly to appear that he has abused his discretion, to the injury or prejudice of the defendant. This question has been recently passed upon by this court in the case of *Ake* v. *The State*, decided at the present term, *post*, p. 398.

The eighth and ninth errors assigned are with reference to the charge of the court. We do not think they are well taken. Considered in its separate parts or paragraphs, or taken as a whole, the charge appears to be an able, lucid, and apt exposition of the principles of law arising from and applicable to the various phases in which the case might be legitimately considered by the jury.

A charge as to its sufficiency or insufficiency is to be examined and tested by its applicability to the facts adduced in evidence. So far as we can see, there was no evidence in this case requiring a charge upon the legal effect of the testimony of an accomplice, and the necessity for its corroboration. There is no testimony tending to establish for the witness Southerland the relationship of accomplice, or *particeps criminis*, to the killing. True, he witnessed the deed, but there is nothing unreasonable or improbable in his statement that he accidentally saw it perpetrated; and though it was attempted to be shown that it was physically impossible he could have seen the occurrence as detailed by him, yet upon this point there was ample and positive testimony to support his statement; and we further find it supported and corroborated in many other material and immaterial respects. True, he tells us that he said nothing to any one about the deed, and his knowledge concerning its perpetration and perpetrators; but the reason he gives for his reticence, until after the arrest of the defendants, is not only a good one, but a highly significant commentary upon a lamentable condition of affairs in some portions of the State, where witnesses have been most foully assassinated

to get rid of their testimony, or have only escaped death by fleeing, like hunted criminals, from their country and their homes.

In all those cases where the law treats a witness in the light of an accomplice, or *particeps criminis*, there must appear facts, or circumstances establishing the fact, or creating a reasonable presumption of guilty complicity. *Kelly* v. *The State*, 1 Texas Ct. App. 627 ; *Carroll* v. *The State*, 3 Texas Ct. App. 117 ; *Davis* v. *The State*, 2 Texas Ct. App. 588 ; *Irwin* v. *The State*, 1 Texas Ct. App. 301.

A motion for a new trial was made by appellants, the main ground of which was to obtain the testimony, at another trial, of their co-defendant, Jesse Brown, who had just been acquitted, and of whose testimony, up to the time of his acquittal, they were deprived by virtue of the fact that he was jointly indicted and on trial with them ; and, in addition to their own sworn statement as to what the said witness would swear, we have the affidavit of Jesse Brown himself, setting out the facts which he will prove.   Succinctly stated, the substance of what it is said he will prove is, that he will contradict the witness Southerland in some of his declarations with regard to statements made to him by the affiant, Jesse Brown ; and, further, the witness Jesse Brown will prove that, on the morning of the day McClain was killed, three armed strangers came to his house and inquired for McClain, and that McClain was hunted after by a party of men from Red River and the Nation.   Further, that one Milas Miller had told affiant that he (Miller) was going to kill McClain, about a week before McClain was killed ; and that Miller told him (affiant) that he was watching around Johnson's house for McClain and one Collier, and if they did not leave the country he would kill them ; that he (Miller) told him that he had found out in the Indian Nation that McClain and Collier were thieves, and that there was a party coming to kill them.

To entitle a party to a new trial in order to obtain the

testimony of an acquitted co-defendant, it seems that it must appear that the testimony which he can give is not only important and material, but that it is also legal and competent evidence. *Rich* v. *The State*, 1 Texas Ct. App. 208 ; *Lyles* v. *The State*, 41 Texas, 172 ; *The People* v. *Vermilyea*, 7 Cow. 369 ; *Huebner* v. *The State*, 3 Texas Ct. App. 458.

Now, let us apply these tests to the application before us. So far as the proposed testimony concerns the evidence of the witness Southerland, it could only go towards his impeachment by contradicting his statements. It is a fixed and well-established rule of law that a new trial will not be granted for the purpose of impeaching a witness. *Hauck* v. *The State*, 1 Texas Ct. App. 357 ; *Terry* v. *The State*, 3 Texas Ct. App. 239. Besides, from the proposed facts stated in the affidavit, it does not reasonably appear that such proof, if admitted, would probably change the result in another trial. *West* v. *The State*, 2 Texas Ct. App. 209.

Was the other portion of the proposed evidence competent and admissible, — that which referred to the armed men from the Indian Nation, and the declarations of Milas Miller, showing his willingness, motive, and intention to kill deceased ? In the Boothe case the new trial was sought upon similar grounds, and this court held that such evidence was not competent or admissible, citing *Crookham* v. *The State*, 5 W. Va. 510 ; *The State* v. *Davis*, 77 N. C. 483 ; *Bowen* v. *The State*, 3 Texas Ct. App. 617 ; *Boothe* v. *The State*, 4 Texas Ct. App. 202.

And where it was proposed to prove that a person other than the prisoner actually admitted that he did the shooting which killed the party for whose murder the prisoner was on trial, it was held that it was not admissible evidence. *Moughon* v. *The State*, 57 Ga. 102. And again : newly discovered evidence to the effect that a witness is prepared to swear that she heard a person, other than the defendant, admit that she did the criminal act of which the defendant

was convicted, will not authorize a new trial.  *Attaway* v. *The State*, 56 Ga. 363.

The court did not err in refusing a new trial on the grounds set out in the motion and affidavits.

It only remains for us to pass upon the sufficiency of the evidence; and whilst some irregularities appear with regard to the preparation of the statement of facts, it is nowhere questioned that the statement as exhibited by the record is a full and complete showing of all the facts elicited upon the trial. We have considered it with great care, knowing that the lives of two human beings were involved in the history of the transaction which it disclosed. With unerring certainty do the facts, so far as we can see, point to defendants as two of the guilty agents who cruelly waylaid and coolly assassinated the murdered man. That he, himself, may have been a bad man — a thief, or even a murderer — would, if it had been proven, afford no mitigation, extenuation, or excuse for "the deep damnation of his taking off" by these defendants. He could not possibly have been guilty of any greater or fouler crime than that which they have perpetrated in his killing, — the crime of murder in the first degree. For such crime the law denounces the penalty of death by hanging. If the punishment is the greatest and most horrible which can be inflicted, so the terror of its certainty should be made to appear in all suitable cases, that men may be deterred from the commission of murder by a consciousness that they cannot escape its penalties.

We believe that these appellants, George Brown, Jr., and Andrew Brown, have been fairly and legally tried and convicted of murder in the first degree; and so believing, the judgment of the lower court, convicting them, is in all things affirmed.

*Affirmed.*