## ROLAND RUCKER *v.* THE STATE.

1. MURDER — INDICTMENT may, in a single count and without duplicity, charge the accused with the murder of two or more persons by the same act. Note collocation of authorities in the opinion.

2. SEVERANCE among defendants is possible only when two or more are jointly charged in the same indictment. · ·

3. PRACTICE. — If several persons are separately indicted for the same offence, neither has a right to have another tried before himself. The act of March 16, 1874, enabled one defendant jointly indicted with another, on obtaining a severance, to have his co-defendant first tried, with the view of qualifying him as a witness by an acquittal; but this act had no application to persons separately indicted for the same offence.

4. SAME. — A motion to have a separately indicted confederate tried first is addressed to the discretion of the court, and its action on the motion is not revisable on appeal. ·

5. CONTINUANCE. — Counter-affidavits are admissible to show that due diligence had not been used to enforce the attendance of the absent witness on whose account a continuance is asked, — as, for instance, that, though the witness had removed to another county, no attachment for him had been obtained. · ·

6. EVIDENCE. — In a trial for murder the State was allowed, over the defend-

ant's objection, to put in evidence an indictment against the defendant for an assault upon one W., and also an indictment against said W., and his bail-bond on which the deceased was a surety. There was evidence of ill-will and threats of the defendant against the deceased on account of the latter thus befriending W. *Held*, in view of the other evidence, that the evidence objected to was admissible to show motive and identity.

7. New Trial. — When there has been a severance of co-defendants, if one of them be convicted and afterwards the other be acquitted, the former will be allowed a new trial for the purpose of obtaining the testimony of the latter, provided it is shown that the testimony will be not only legal and competent, but such as will probably change the result of the case. In resisting such an application the State may show the acquitted defendant and his testimony to be unworthy of belief, and therefore not such as could change the verdict. Note the present case in illustration.

8. Practice. — Counsel for the State in a trial for murder used before the jury in the concluding argument an allegorical drawing to depict the chain of circumstantial evidence relied on to identify the defendant as one of the assassins. The defence made no objection at the time, but assign the use of this "caricature" as one of the causes in the motion for a new trial. *Held*, without discussing the merits of the objection, that it should have been raised at the time, and was not available when primarily mooted in the motion for a new trial.

9. Accomplice Testimony. — The ruling on this subject in *Noftsinger* v. *The State*, *ante*, p. 301, referred to with approval.

Appeal from the District Court of Anderson. Tried below before Hon. R. S. Walker.

The midnight assassination of Dr. R. P. Grayson and his wife, at their home in Anderson County, on April 23, 1878, was a deed characterized by circumstances of unsurpassed atrocity. Roland Rucker, the appellant, is one of the seven persons to whom it was imputed by the grand jury of that county, where the several parties charged, as well as the deceased, had their homes. The evidence in the case, elicited in great detail from many witnesses, was to a great extent circumstantial. The leading facts will be found clearly stated in the concluding portion of the opinion of this court.

An analysis of the indictment and a statement of all special matters germane to the rulings will also be found in the opinion. The drawing or " caricature " used by

counsel for the prosecution in the concluding argument to the jury, and of which mention is made in the opinion, represented the corpse of Grayson at one end of a chain, and at the other end a boat containing seven men, over whose heads were written the names of the appellant and the six other persons charged with the crime. In the links of the chain were words indicative of the circumstantial proof relied on by the prosecution. The counsel who used this drawing claimed that it was a legitimate response to illustrations employed in argument for the defence.

The conviction was for murder in the first degree, with death adjudged as the penalty. After the affirmance of the judgment by this court, a motion for rehearing was filed, but it was overruled. The arguments of counsel filed in this court are of signal ability ; but they are too elaborate for insertion at length, and nothing less would do them justice.

*R. A. Reeves* and *Gammage & Gregg*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

WHITE, P. J. In the indictment in this case Roland Rucker, the appellant, is alone charged with the murder of Dr. R. P. Grayson and his wife, Marian Grayson, in Anderson County, Texas, on the night of the twenty-third day of April, 1878. There are three counts contained in the indictment. In the first and second it is alleged that appellant committed the deed in connection with other evil-minded persons, who are not named, — the only difference in these two counts being that in the first it was charged a rifle-gun was the instrument, whilst the second alleged that a pistol was the means used in the accomplishment of the deed.

It is charged in the third count that Roland Rucker committed the murder, in connection with Hugh Du Puy, Reuben Rucker, Charles Key, Melville Quisenberry, James Quisenberry, and Fayette Bowen, all of whom engaged in

the assault and inflicted the mortal wounds with guns and pistols. But these last-named parties are not directly and specifically charged anywhere in this indictment with the murder, nor does the third count seek further to embrace them in the crime than by way of inducement as to the circumstances and the manner and the means used and availed of in its perpetration by the defendant, Roland Rucker. It may, however, be well to state in this connection that at the same term of court in which this indictment was preferred all the parties named in its third count were indicted in other indictments for this same murder; two of the other indictments being joint, to wit, one against Reuben Rucker and Charles Key, and the other against Hugh Du Puy and James Quisenberry.

A motion was made by defendant to quash the indictment upon the ground that it was duplicitous and that it charged the commission of two distinct offences against two different persons; and that a charge for the murder of two persons could not be joined in one count or in one indictment for murder. Mr. Archbold, in his standard work on Criminal Pleading and Practice, vol. 1 (6th Am. ed.), side p. 96, says: "There is no objection to charging a defendant in one count with assaulting two persons when the whole forms one transaction." Citing *Rex* v. *Benfield*, 2 Burr. 984, an opinion delivered by Lord Mansfield, C. J.

Mr. Wharton says: "A man may be indicted for the battery of two or more persons in the same count, or for libel upon two or more persons when the publication is one single act, or for a double homicide by one act,  *  *  * without rendering the count bad for duplicity." 1 Whart. Cr. Law (7th ed.), sect. 393.

"In *Regina* v. *Giddings et al.*, 41 Eng. Com. Law, 344, the indictment, which consisted of but one count, charged the four prisoners with assaulting George Pritchard and Henry Pritchard, and stealing from George Pritchard two shillings and from Henry Pritchard one shilling and a hat, on the

14th of May, 1842.   It appeared that the persons assaulted were walking together when the prisoners assaulted and robbed them both.   A motion was made to put the counsel for the prosecution to his election, upon the ground that the count charged two distinct felonies ; but the court held that as the assaulting and robbing of both individuals occurred at the same time, it was one entire transaction." *Shaw* v. *The State*, 18 Ala. 547:

In *Ben* v. *The State*, 22 Ala. 9, it was held that "in an indictment against a slave for administering poison to white persons a count was not demurrable for duplicity which charged that the defendant did administer to and caused to be administered to and taken by *three* certain white persons a large quantity of arsenic," etc.

In the celebrated case of *Clem* v. *The State*, 42 Ind. 420, the court says : "If it be true, as we suppose it is, that the killing of two or more persons by the same act constitutes but one crime, then it follows that the State cannot indict the guilty party for killing one of the persons, and after conviction or acquittal indict him for the killing of the other ; for the State cannot divide that which constitutes but one crime, and make the different parts of it the bases of separate prosecutions."

The Supreme Court of Tennessee, in *Womack* v. *The State*, say : "Two totally distinct and separate felonies cannot be charged in the same count of the indictment ; and if it appears upon the face of the indictment that the defendant is charged in the same count with the killing of two persons as distinct transactions, the indictment would be quashed.   But a single felonious act may result in the death of two individuals ; and though in such a case the offender might be indicted for the murder of one only, he may be indicted for a single offence of murder in the act of slaying both."   7 Coldw. 508.

That the same offence has been charged in different counts to have been committed with different instruments

or weapons does not tend to render the indictment invalid or duplicitous ; for, as we understand the practice as it has always existed, it is but reënacted or formally declared by a new provision inserted into our Revised Code to the effect that " an indictment or information may contain as many counts charging the same offence as the attorney who prepares it may think necessary to insert, and an indictment or information shall be sufficient if any one of its counts be sufficient." Code Cr. Proc., art. 433 ; *Waddell* v. *The State,* 1 Texas Ct. App. 720 ; *Weathersby* v. *The State,* 1 Texas Ct. App. 643 ; *Barnwell* v. *The State,* 1 Texas Ct. App. 745 ; *Dalton* v. *The State,* 4 Texas Ct. App. 333 ; *Williams* v. *The State,* 59 Ga. 400. Involving and declaring the same doctrine are the following cases decided in this State : *Long* v. *The State,* 43 Texas, 467 ; *Wilson* v. *The State,* 45 Texas, 76 ; *Quitzow* v. *The State,* 1 Texas Ct. App. 48 ; *Addison* v. *The State,* 3 Texas App. 40.

No error was committed by the court in overruling defendant's motion to quash the indictment in this case.

2. Defendant's first bill of exceptions was taken to the action of the court in forcing him to trial before the case of *The State* v. *Reuben Rucker and Charles Key,* indicted together for this same murder in another and separate indictment from defendant, had first been tried and disposed of. Though separately indicted, it appears that at the January term, 1879, this defendant made a motion for a severance from several other of the separately indicted defendants, stating as a reason for the motion that there was no evidence against such other defendants, that their testimony was material to the defence, and that he desired their trial and acquittal that he might have the benefit of it. A severance was granted him, and an order entered that Charles Key should first be tried. Again, at the May term, 1879, he renewed his motion for a severance, and asked that the case of Reuben Rucker and Charles Key be first tried. The bill of exceptions, which is presumed correct since it is signed

and certified by the presiding judge, states that this motion for severance was again granted by the court on the 26th of May, and that on the same day (26th) the case of *The State* v. *Reuben Rucker and Charles Key* was called for trial, and on application for the State was continued. Upon the following day appellant's case was again called for trial, when he made a motion to postpone the trial, setting forth in his motion the previous orders of severance and that they were unrevoked, and asking their enforcement and observance as to the order of trial. It is claimed that the court committed a grave and most serious error, and one greatly prejudicial to the rights of defendant, by overruling this motion and forcing him to trial.

Now though the defendant's application for severance was made in conformity with the provisions of the act of March 16, 1874, amendatory of art. 587 of the Code of Criminal Procedure (Gen. Laws, 14th Leg. 29), it is clear that he was not entitled to a severance under the statute, since it was passed for the benefit of, and applies solely to, defendants " jointly prosecuted," and does not apply to cases of separate and distinct prosecutions. *Boothe* v. *The State*, 4 Texas Ct. App. 202. His application, however, was doubtless considered good by the judge granting it, under the provisions of art. 230 of the Penal Code (Pasc. Dig., art. 1826), which provides that " persons charged as principals, accomplices, or accessories, whether in the same indictment or by different indictments, cannot be introduced as witnesses for one another; but they may claim a severance, and if any one or more be acquitted they may testify in behalf of the others."

So far as we are aware, this statute has never been construed (except in *Boothe's Case*, above cited, and there only by implication) to mean that a severance was intended to be allowed to parties separately indicted. We are aware that such a construction is generally claimed for it, and upon a cursory reading would seem to be warranted by the unqualified expression " but they may claim a severance."

Still we can but think that to so hold would be a misapplication of terms, and wholly inconsistent with the plain import of the word "severance," which means "the act of severing," "separation," "the act of dividing or disuniting." How is that susceptible of separation which has never been joined, or that of being disunited which has never been united? We believe that the plain meaning and intention is and was to make the words "but they may claim a severance" apply to persons charged as principals, accomplices, and accessories in the same indictment, and that in such joint indictments only was it intended a severance might be claimed. This construction harmonizes with art. 587 of the Code of Criminal Procedure (Pasc. Dig., art. 3052), which was adopted at the same time the Penal Code was adopted, to the effect that "where two or more defendants are *jointly* prosecuted they may sever on the trial at the request of either;" clearly showing that a severance could only be had in a case of joint prosecution. At the same time it was the further object and purpose of the law (art. 1826) to prevent persons jointly or separately indicted for the same offence from testifying for one another until the party so testifying had been previously tried and acquitted of the offence charged against him. The statute to this extent changes the common-law rule of evidence which allowed one indicted as an accomplice, if not put on trial at the same time with his companions in crime, to testify as a competent witness either for or against them. 1 Greenl. on Ev., sect. 379. In so far, then, but no farther, does the Code change the rule at common law, that, while the prosecution is pending against all the defendants and they all stand charged (no matter how, so they are charged) with the perpetration of the same crime, if neither have been acquitted nor convicted they are incompetent to testify as witnesses for one another. This, we think, is the extent of the change of the rule of evidence effected by the Code. *Tilley* v. *The State*, 21 Texas, 200.

Before the adoption of the Code the common law fur-

nished us with the rule of evidence, and in addition to it the defendants jointly indicted and put upon trial could also avail themselves of a right which in effect was equivalent to the severance as afforded in the statute, by asking, after the evidence for the prosecution had been introduced, that the jury be then required to pass upon the same so far as one or more of the defendants were concerned against whom there was slight or no evidence, in order that if they were acquitted their co-defendant or co-defendants might have the benefit of their testimony. *Jones* v. *The State*, 13 Texas, 168 ; *Bybee* v. *The State*, 36 Texas, 366.

The act of March 16, 1874 (Gen. Laws 14th Leg. 29), which only carries out and harmonizes with the above construction, amended art. 587 of the Code of Criminal Procedure, and in addition to the right of severance theretofore given to defendants *jointly* prosecuted gave them the further right upon certain conditions to have a co-defendant first put upon trial. We are of opinion that it follows from a plain construction of all our statutes upon the subject that a severance is only demandable in cases of joint prosecution ; that where the prosecution is not joint, a motion by one defendant to try another party first, indicted separately for participation in the crime, whether as principal, accomplice, or accessory, is not a right under the law, but rather a matter addressing itself entirely to the favor or sufferance of the court, and one which if granted or refused is not a subject of revision or appeal to this court.

Before the adoption of the amendatory act of March 16, 1874, and since in all cases not coming within the scope and purview of that act, where a severance of *joint defendants* was claimed and granted, the uniform rule, no matter what the ground of severance as sought by defendant might be, was that the prosecution had the unquestioned and undisputed right to elect which of the joint defendants should first be tried. *Boothe* v *The State*, 4 Texas Ct.

App. 202. The object of the amendment was to confer. upon the defendant a right in joint prosecutions, to which he was not before entitled, of compelling not only a severance, but of selecting the party who should first be tried. But, as before stated, this act also applies only to joint prosecutions. We are clearly of opinion, upon mature consideration of the law in all its aspects, that there is and can be under our statutes no such thing as severance except in cases of prosecution by joint indictments. If such a construction should appear to be harsh in cases where, though the indictments are separate, the offence is clearly one and the same transaction, we say the defect in the law or the harshness of the rule is one which addresses itself for change or modification to legislative action, and cannot demand unauthorized judicial legislation to give it a different effect.

In its application to the question under consideration, it follows from the above reasoning that at the time the court below granted to the appellant a severance from Reuben Rucker and Charles Key no such thing as a severance could in law exist, the parties being separately prosecuted. Further, that an order that Reuben Rucker and Charles Key, because they were indicted for the same crime, should first be tried was one which the court might as a matter of favor grant or refuse as it saw fit in the first instance, and afterwards was one entirely within its control and in no way subject to revision. And being entirely within the control of the lower court, that court had a perfect right, after the case of Reuben Rucker and Charles Key had been called and was continued, to recall appellant's case again for trial, and force him to trial, in the absence of any other legal and sufficient reason why it should not take place at the time.

3. This brings us to defendant's second bill of exceptions, which was saved to the action of the court in overruling his application for a continuance. This was his second application, and it embraced eight witnesses for whose absence the continuance was sought. All, however, appeared and

were present during the progress of the trial, except two, viz., W. J. Salmon and Robert Lowe. With regard to these two witnesses the prosecution filed a counter-affidavit impeaching the diligence used to secure their attendance, the substance of which was that several months before the trial each of the witnesses had removed from Anderson County. It is now the settled rule in this State that diligence may be controverted in this manner. *Hyde* v. *The State*, 16 Texas, 445; *Dixon* v. *The State*, 2 Texas Ct. App. 530; *Murry* v. *The State*, 1 Texas Ct. App. 174. The application shows that Lowe was subpœnaed the 12th of June, 1878, and Salmon on the 21st of January, 1879. If the counter-affidavit spoke the truth, then Salmon had ceased to be a citizen of Anderson County and was in fact a resident of Houston County when this subpœna was issued and served upon him, and it was not such process as could compel his attendance in a county in which he did not reside. *Chaplin* v. *The State, ante,* p. 87. The witness Robert Lowe was subpœnaed the 12th of June, 1878. On the day following (13th) defendant made his first application for continuance, which was granted, and Lowe was one of the absent witnesses therein named and whose testimony was thus desired. No additional process was ever afterwards taken out for him; and according to the counter-affidavit, this witness also, in the summer of 1878, which must have been a short time after the first continuance was granted, moved his residence to, Concho County. In view of these facts, we do not think the record discloses the diligence the law requires, and consequently the court did not err in overruling the second application.

4. The fourth error assigned is the admission in evidence, over defendant's objections, of an indictment against appellant Roland Rucker and one Hugh DuPuy for an assault with intent to murder one William Wilson; and also an indictment against Will Wilson and Willis Jasper for theft of cattle, and the bail-bonds executed by these last two defendants, with R. P. Grayson, the deceased, as one of the

sureties upon the bail-bonds.    In and of itself the evidence
would clearly have.been inadmissible ; but taken in connec-
tion with the other facts in the case, as will hereafter be
seen, the evidence tended to establish a reason for and the
motive which actuated the hostility of defendant towards
the deceased, and was an appropriate matter to be consid-
ered and weighed by the jury, in connection with the other
testimony, in determining the question of motive and fixing
the identity of the murderer.    *Dill* v. *The State*, 1 Texas
Ct. App. 278 ; *Coward* v. *The State*, 6 Texas Ct. App. 60 ;
*Somerville* v. *The State*, 6 Texas Ct. App. 433. ·

. . 5. Most of the questions raised in the original motion for
a new trial have been considered and disposed of in the
conclusions above expressed with regard to the subjects
discussed.   Several days after the original motion was filed,
defendant submitted an amended motion, setting up as a
further ground for new trial that Fayette Bowen, one of the
parties separately indicted for the murder, had been put
upon trial and acquitted after the trial and conviction of
defendant, and that Bowen was a material witness for de-
fendant, and one whose evidence was inaccessible until his
acquittal had rendered him competent to testify.   Support-
ing this motion was the affidavit of Bowen himself, declaring
the facts to which he would testify if a new trial should be
awarded.    These facts as stated by him are simply contra-
dictions and denials of facts stated by the witnesses for the
prosecution.    .  ·

To meet this amended motion the prosecution filed the
affidavits of McClure, Rogers, Durham, and Palmer.    Mc-
Clure's affidavit contained the substance of the testimony
given by Bowen in a trial on *habeas corpus* of Roland
Rucker and others for bail, on the 4th of June, 1878, shortly
after they were arrested for this murder, and in which tes-
timony Bowen declared that he and the defendants then
before the court had committed the murder, and detailed
the circumstances of the transaction.

·   The affidavit of Rogers and Durham detailed a statement

made to them and one Gilbert by Bowen on Thursday, two days after the murder, in which he confessed that he and the other parties afterwards indicted had committed the crime.

The other affiant, J. R. Palmer, states that he was a justice of the peace and sat as an examining court on the second day of May, 1878, to investigate the charge of murder against Roland Rucker and the other defendants afterwards indicted for the murder, who were then under arrest; that Bowen appeared as a witness upon the trial; that he cautioned him before he testified that his statements might be used in evidence against him, and fully advised him of his rights in the premises; after which Bowen testified to his own guilt and that of the other defendants. In addition to these affidavits, the prosecution then produced and read in evidence the written testimony of Bowen as deposed to by him on the examining trial before Justice Palmer, in which Bowen gave a minute and detailed account of the circumstances of the murder, and named the individuals participating in it, himself and this defendant amongst them.

The motion and amended motion for a new trial were overruled by the court, and this action is made the basis of the third bill of exceptions and the fifth assignment of error.

There can be no doubt at this day as to the rule, or the correctness of the rule in proper cases, as now established in this State, that where two are jointly indicted, and one is tried and convicted, and subsequently the other is tried and acquitted, a new trial will be granted the former to obtain the testimony of the latter, where it appears that the new evidence is legal and competent and material to his defence. *Lyles* v. *The State*, 41 Texas, 172; *Rich* v. *The State*, 1 Texas Ct. App. 206; *Huebner* v. *The State*, 3 Texas Ct. App. 458; *Williams* v. *The State*, 4 Texas Ct. App. 5; *Brown* v. *The State*, 6 Texas Ct. App. 286. But

the evidence must be legal and competent, and such as would likely affect the result upon another trial.

We find the correct rule, as we believe, stated in Graham and Waterman on New Trials. There it is said: "An application of this kind to the court may doubtless sometimes have a strong claim for relief. The case should therefore be carefully investigated and considered with reference to the peculiar circumstances which belong to it. If the testimony of the acquitted co-defendant can be corroborated by other evidence, or if the testimony on the trial has shown that he was accused wrongfully, so that his integrity is wholly unimpeached, what is offered to be proved by him will as a matter of course have weight with the court; and if his evidence will be likely to change the verdict a new trial will be granted. But if his evidence be of a suspicious import, if it stand alone, if though acquitted it be uncertain whether he is innocent, and if his character be so far compromised as to make it doubtful whether he ought to be believed, the motion will generally be denied." 3 Gra. & Wat. on New Tr. 1107.

In a recent case in New York, on a motion for a new trial upon the ground of newly discovered evidence, it was held that though it appears that the proposed evidence is of a highly important character, and bears directly upon the very issue in the cause, yet, notwithstanding, a new trial will not be granted if such evidence is to be given by a witness not entitled to credit, or is not supported by such other facts and circumstances as would justify a jury in believing the story of the new witness. *Cole* v. *Cole*, 50 How. Pr. 59. It is true the case last cited is a civil case, but it will be remembered our statute declares that "a motion for a new trial based upon newly discovered testimony shall be governed by the same rules as those which regulate civil suits." Pasc. Dig., art. 3137, subdiv. 6. And the testimony of an acquitted co-defendant, on a motion for new trial, has generally been classed with and treated by

law-writers under the head of newly discovered evidence, though it cannot correctly be said that the evidence is technically newly discovered.    3 Gra. & Wat. on New Tr. 1107.

Now let us apply the rules above quoted to the testimony of Bowen as presented by this record.   Does it appear that he was wrongfully charged with this murder?   We have on the one hand a verdict of not guilty by a jury upon evidence not before us, and on the other his own sworn statements on the examining and *habeas corpus* trials that both he and the defendant Rucker participated in and were guilty of the murder.   Is his integrity wholly unimpeached?   Let his own sworn statements in these other cases answer.   Out of his own mouth he is condemned of perjury either in the one or the other case, it matters not which.   Would his evidence likely change the result upon another trial?   The apparent facility with which he seems to have perjured himself warrants us in believing that he is devoid of all moral integrity, from which truth alone can flow ; " and it shocks our sense of justice and right to suppose that statements which come from such lips can or should exercise any weight whatever in the administration of justice."

Another matter presented for the first time in the motion for new trial, and which is very earnestly urged as error in the briefs and argument of counsel, is in the manner of its presentation not a matter properly before us for revision. We allude to " the caricature," as it is called by counsel, which was a drawing prepared and used by counsel for the prosecution in the closing argument to the jury.   To have made the objection to the introduction and use of this drawing as illustrative of and in connection with the argument available to defendant, he should have objected to its use at the time, and reserved his bill of exceptions if over his objections the court had permitted counsel to use and comment upon it.   This was not done, and for aught that appears it was used without objection, and the afterthought by defendant that it was prejudicial to his rights could not

be taken advantage of by him for the first time on his motion for a new trial. Whether it was proper or improper, legal or illegal, is not a matter before us for revision, and it is therefore unnecessary to notice it further.

6. We do not feel called upon to discuss the charge of the court as given to the jury, since no objection is made to it as given. Suffice it to say it was a most elaborate and learned presentation of the law upon murder of the first and second degrees, and upon the rules of law appertaining to circumstantial evidence, and on the question of *alibi*, one of the main defences relied upon. Nor was any error committed in refusing the special instruction asked by defendant as to the testimony of an accomplice. The only witness to whom this instruction was, if at all, applicable, did not come within the category of an accomplice, as was recently held by this court upon a similar state of case at Tyler, in *Noftsinger* v. *The State, ante,* p. 301.

7. It only now remains for us to declare whether or not the evidence as shown by the record is sufficient to support the verdict and judgment. Being a case of circumstantial evidence, we have endeavored carefully to weigh each fact necessary to the establishment of the chain of facts which as a whole should constitute the guilt of defendant to a moral certainty beyond any reasonable hypothesis. That the defence have contested every step taken by the State with great zeal and ability, as each inculpatory fact was brought to light, cannot be denied; that some apparent conflict has been created in many particulars may be admitted. But divesting the case of all extraneous and immaterial matters, and coming down to the points in the evidence which stand out in bold belief, unimpeached and unshaken, to our minds the statement of the evidence still bristles with facts which cannot be the work of chance nor be reconciled with defendant's innocence. No matter who else may have participated in this horrible murder, to us it seems clear, as it must have been to the minds of the jury

who tried this case, that if Grayson and his wife were murdered as alleged, then this defendant was one of the murderers, if not the chief and main instigator of the foul deed.

On the Saturday before the killing we find him in Palestine, actively engaged in begging and inviting parties to go with him down into Grayson's neighborhood Tuesday night to run off negroes whom he said Grayson was protecting, and stating that they intended to get away with Grayson and the negroes if they had to kill the last d—d one of them, and that Grayson was a d—d old Radical anyway. At the same time he purchases the Henry rifle of Louis Kopf. He had already been indicted for an assault with intent to murder one of the negroes, upon whose appearance-bond Grayson had become security in another case, and he was apprehensive that under Grayson's advice he would be again indicted in the Federal court for kukluxing these negroes. This is the substance of the testimony of several witnesses, in brief, and shows the motive which was actuating him.

On Tuesday night about one o'clock an alarm is made by some one in front of Grayson's house. His wife goes to the door to ascertain the cause, and was told by the party that his (the party's) wife was sick in camp near Ironi bridge, and that he wanted the doctor to go and see her and help her if he could. Grayson got up and went out upon the gallery and asked where the sick woman was. The reply was three successive volleys from a number of guns. When Grayson was next seen he was found dead upon his threshold, with more than fifty bullet-holes in his body, while the corpse of his murdered wife was found in her bed inside the house, surrounded by her helpless little children.

The alarm is given, and by daylight a number of neighbors gather and commence to ferret out the authors of th deed. Tracks of footprints are seen at the yard fence be hind which the assassins stood when the fatal shots were

fired.  Upon the gallery and ground are found pieces of wadding fired from the guns, and in the yard a number of empty shells of exploded Henry rifle cartridges are picked up.  But this is not all ; it had rained but recently before, and near the mouth of the lane is found the place where had been hitched the seven animals which the murderers had ridden to and from the fatal spot.  The tracks of these animals were plainly to be seen and were easily followed. They are followed without trouble or loss over hill and valley and through woods and brush for between eighteen and twenty miles, until some of them lead directly to Calvin Rucker's, where this defendant lives, and they are found going no further.

These exploded Henry rifle cartridge shells, those silent but tell-tale horse-tracks, taken in connection with his own previous motives and declarations, point with the unerring certainty of fate to this defendant as one of the assassins of the unfortunate Grayson and his wife.  Murder is always horrible to contemplate, but the details of this dark deed of crime may well challenge the whole catalogue to furnish a deeper, darker, or more heartless example of enormity. At the dead hour of night, with a pretended appeal to his humanity, the physician is called from his bed, and in the very act, doubtless, as he supposed, of going to alleviate human suffering in the person of a stranger, his own life and that of his innocent wife are taken by the hand of the concealed murderers, without the slightest warning or a single moment for preparation.

, So far as we have been able to see from this record, the defendant has had a fair and impartial trial in the court below.  He has been most ably and zealously defended by counsel learned and distinguished in the law.  Every facility has been afforded him to meet the charge, and every right carefully guarded which the law concedes to one whose life is involved in the issue of trial.  We are constrained to say that we have been unable to find in the whole record

any sufficient reason why this court should disturb the action of the court below, and the judgment is therefore affirmed.

*Affirmed.*