9    419
30   621

## P. S. NOLEN *v.* THE STATE.

1. JURY LAW. — Among the causes for challenge of a petit juror prescribed by the Code of Procedure is his inability to read and write, provided a sufficient number of jurors not thus disqualified can be obtained. *Quære :* whether this disqualification has reference to inability to read and write the English language, or, on the other hand, whether a juror who could read and write German and speak English is a qualified juror? Note the collocation in the opinion of authorities bearing on the question, and the suggestion of considerations which affect it *pro* and *con.*

2. CONFESSIONS MADE IN ARREST. — In a trial for murder, the State was allowed, over objection by the defence, to prove certain of the defendant's statements in the nature of confessions — the objection being that the defendant was in arrest when he made them. See the predicate on which the court below overruled the objection, but from which this court concludes that the defendant was actually in arrest at the time, whether he knew it or not, and that his statements were therefore improperly admitted in evidence.

APPEAL from the District Court of Medina.    Tried below before the Hon. T. M. PASCHAL.

The present appeal is from a second conviction of the appellant for murder in the second degree, upon an indictment which charged him with the murder of one Sandy Winn.    The punishment assessed by the jury was a term of ten years in the penitentiary.

The first conviction of the appellant was set aside by this court on grounds which appear in 8 Texas Ct. App. 585.

There, also, will be found a full statement of the facts of the case, according to the testimony. The opinion now reported states such other facts as are germane to the rulings.

*A. P. Bagby,* for the appellant.

*Thomas Ball,* Assistant Attorney-General, for the State.

WINKLER, J. This case is before us for the second time on an appeal from a judgment of conviction of murder in the second degree. The first judgment was reversed mainly on the ground that the court below had, in our opinion, improperly admitted evidence of statements made by the defendant while under arrest to go to the jury. See the case reported in 8 Texas Ct. App. 585. It is proposed, in considering the present appeal, to notice but two questions presented by the record, which are, first, supposed error in the action of the court in overruling the defendant's challenge for cause to certain jurors who sat upon the trial; and, second, supposed error in admitting to the jury, in evidence, certain statements and acts of the defendant while under arrest. These questions are presented by proper bills of exception embodied in the record, and will be treated in the order set out above, but we will perhaps pass finally on the latter.

It is made to appear that, after the defendant had exhausted nine of his ten peremptory challenges, three jurors were offered and accepted by the State who, on their examination on *voir dire,* stated that they could neither read nor write the English language, and they were challenged by the defendant as incompetent jurors, on the ground that they could not read or write the language in which the proceedings of the court were conducted; it being shown, by a statement appended to the bill of exceptions given by the judge, that the jurors also stated that they read and wrote the German language and spoke the English. The challenge was overruled. The precise question here presented

by the record is this : Is it cause for challenge that a juror is unable to read and write the English language? In determining this question it will be necessary to notice the provisions of law, both constitutional and statutory, and construe the legislative enactments with reference to the provisions of the Constitution. The Constitution declares that " in all criminal prosecutions the accused shall have a speedy public trial by an impartial jury." Bill of Rights, sect. 10. The Code of Criminal Procedure, art. 636, declares that a challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury, and it may be for either of the following causes :   *   *   *   " 14. That he cannot read and write." But it is also provided that this cause of challenge shall not be sustained where it appears to the court that the requisite number of jurors who are able to read and write cannot be found in the county. The naked question here presented is this : What is the scope and extent of the meaning of the words " that he cannot read and write " ? Is the expression to be held to mean those who have the ability to read and write any language whatever, whether known and understood in this country or not, or is it to be confined to any particular language ; and if so, to what particular language?

In *Lyle* v. *The State*, 41 Texas, 172, it was held that those who did not understand the English language were not competent jurors, apparently on the ground that they were unable to comprehend the proceedings in court, they being conducted in that (the English) language. In *Etheridge* v. *The State*, 8 Texas Court of Appeals, 133, it was said that " ignorance of, or inability to speak and understand the English language, though not mentioned, [as a disqualification by statute] has always been held a disqualification by virtue of the constitutional guaranties of a fair and impartial trial, and one conducted by due course of the law of the land." Mr. Bishop, in his work on Criminal

Procedure, vol. 1, sect. 925 (latest edition), lays down a general rule on the subject to this effect: An insane person is incompetent; so is one who is drunk. "Likewise, one unacquainted with our language is more or less disqualified, according to the extent of the incapacity and the time and manner of taking the objection." This rule seems to have been deduced from *Lyle* v. *The State*, and *The State* v. *Push*, 23 La. An. 14, as these are the cases cited. We have already referred to the ruling in Lyle's case. In Push's case, as we find it reported, the Supreme Court affirmed the action of the court below, where a challenge made by the State was sustained on the ground that the juror did not understand the English language, but only the German. In *White* v. *The State*, 52 Miss. 216, it was said there was nothing in the objection that the juror could neither read nor write. In the case in 2 Hawley's American Criminal Reports, 454, this ruling is based on the fact that the Legislature has not defined an educational or intellectual qualification in that State for jurors. In *Atlas Mining Company* v. *Johnson*, 23 Mich. 36, it was said, "We think the court has a discretion in this matter; * * * and, as to the juror who was excused because he did not understand the language, we think it would have been highly improper to have allowed him to sit in the cause, though unchallenged." In the case of *Montague* v. *The Commonwealth*, 10 Gratt. 767, it was held that, on a trial for felony, the court, of its own motion, without suggestion or consent of either party, may excuse or set aside a juror who is in all other respects competent, because, among other grounds, of his ignorance of the vernacular tongue, whereby he is rendered physically or mentally unfit. This is the extent to which accessible authorities go.

It must be conceded that none of these authorities goes to the extent of deciding the precise question under consideration. We confess it is a difficult and embarrassing question. To hold that the Legislature meant that those only who are

able to read and write the English language are competent to serve as petit jurors would seem a hardship to many intelligent citizens of superior education, though wholly ignorant of the English language in so far as ability to read and write it are concerned ; whilst to hold that it extends to those who can read and write any language whatever would admit to the performance of jury duty those otherwise objectionable, but who are not otherwise excluded.   When we consider, however, that the English is the common language of the country, and that it is the language in which our courts are conducted, and in which all our legislative proceedings have been conducted from the date of our Declaration of Independence, in 1836, to the present time, and particularly when we consider that this was the language in which were conducted the proceedings of the Legislature which passed the law in question, and in which the laws were all written, in connection with the manifest fact that the Legislature intended to place the jury service in the hands of those who were fitted for its performance by virtue of their interest in the due administration of the laws, to the exclusion of the rabble, we confess that the inclination of our minds is to hold that when the Legislature enacted the law that inability to read and write is a disqualification of a juror, they had in their minds the language they themselves made use of, and the common language of Texas and the other American States — the English language.   But, inasmuch as the question is important, and because its solution is not indispensable to a decision of the present case, we decline to do more at present than to call attention generally to the subject, in order that it may be thoroughly investigated, and, if need be, that a legislative expression may be elicited.   We simply indicate our present impressions, as the result of the investigations we have had opportunity to make.

The judgment of the District Court must be reversed, however, not upon the ground we have been discussing, but on

the other of the two grounds mentioned at the outset, to wit, the introduction of incompetent evidence to the jury over objection by the defendant.

It is shown by the evidence that one Shane, with a member of the State troops, and one Tomlinson, went in pursuit of the supposed murderers of the deceased, and that the pursuing party came upon the defendant at the house of one John Camp. The witness Shane being on the stand and testifying on behalf of the State, he was asked the following question: "You will please state what the defendant Nolen said to you after you left John Camp's house?" To which question the defendant objected. The position contended for by the defence is that the defendant was under arrest, and was so under arrest from the time the party having him in charge left the house of Camp. The jury were sent away, and the examination of the witnesses proceeded before the court. The bill of exceptions shows that after this examination the court overruled the defendant's objections and permitted the witness to answer the question. The judge, in giving the defendant a bill of exceptions, makes the following statement in explanation of his ruling, to wit: "The court was satisfied, from a careful examination of the witness Shane, that nothing was said or done to indicate or recall to defendant the character or purpose of the witness or those with him, and the court was satisfied that defendant did not know or even suspect that he was regarded by Shane as a prisoner, or in their custody; the statement of Shane that Carothers told him that he had taken defendant's pistol and money from his saddle-bags being regarded by the court as strictly hearsay, the evidence satisfying the court that Nolen did not and could not have heard Carothers' statement."

The matter will be best understood by transcribing from the bill of exceptions what the witness Shane stated after the jury had withdrawn, in order to satisfy the mind of the court whether or not the defendant was in custody. "The witness Shane testified, in reference thereto, that he, Walk

Tomlinson, and one Carothers, a non-commissioned officer of the State Rangers, being in pursuit of Nolen, reached John Camp's house between daylight and sunrise. They saw Nolen on the gallery, dressed and putting on his boots. Witness passed to the rear of the house, and the other two stepped on the gallery where Nolen was. In a short time Carothers came around the gallery, called witness, and said to him in a low tone (Nolen being some twelve or fifteen feet distant) that he had taken Nolen's pistol and a sack of money from his saddle-bags, and desired witness to come and talk to him (Nolen). Witness went on the gallery with Carothers. The saddle-bags were lying on the gallery three or four feet from Nolen. Tomlinson remained on the gallery when Carothers stepped out to call me. When I went on the gallery I talked to Nolen, telling him that we were in pursuit of stolen horses and wished to examine his caballado; to which he made no objection. From the time we got where Nolen was, we watched him. We would not have allowed him to go away. I regarded him as a prisoner, but I do not think he so regarded himself. He was involuntarily restrained of his liberty. Carothers, Tomlinson, and myself were armed; Nolen was unarmed. While we were there a young man came up and asked Nolen to go and look at some mules, to which he replied that he did not have time to go that trip, as he had to go with us to his caballado. I did not hear what passed between Carothers, Nolen, and Tomlinson when they first went on the gallery, as I had passed to the rear of the house to prevent Nolen from escaping in that direction. I did not see Carothers take his pistol and money, nor do I know that Nolen saw him take them, but when I came around the saddle-bags were lying within three or four feet of Nolen. Carothers was in charge of the party in pursuit of Nolen, he being a corporal of the Rangers."

We do not wish to controvert the statement of the judge appended to the bill of exceptions, to the effect that what Carothers told Nolen was but hearsay: still, after a careful

examination of the testimony as set out in the bill of exceptions, together with the testimony as set out at large in the statement of facts, our minds are led to a different conclusion from that reached by the judge who presided at the trial below. The testimony on the point as to whether Nolen was in fact placed under arrest at the house of Camp is, it is true, not so full as on the former trial. All the witnesses who testified on the first trial seem not to have testified at the second. Still, we are of opinion it is sufficient to show that Nolen, the defendant, was in fact arrested and in the custody of the pursuing party headed by Corporal Carothers, of the Rangers, from the time the party surrounded him at the house of Camp, they being armed and he unarmed. We do not deem it important that the defendant should have been informed in so many words that he was arrested. The facts disclosed by the evidence show very clearly that the pursuing party, at the time they came upon him, showed that they had secured him, and would not have permitted him to escape if he had attempted it. The confessions of the defendant, from the time of his arrest at Camp's house, as detailed by the witness, are the same and subject to the same rules as prescribed by art. 750 of the Code of Procedure, and which should govern. An application of the provisions of this article would have excluded any confession made by the defendant under the circumstances disclosed by the record.

It may be said that the testimony we deem to have been improperly admitted was comparatively of little importance; but in a case like the present, where a conviction is dependent entirely on circumstantial evidence, an apparently slight error may become of the utmost importance to the rights of the defendant. Other questions presented are not considered, as they are not likely to arise on another trial. But, for the error committed in admitting improper evidence, as above indicated, the judgment must be reversed and the cause remanded for a new trial.

*Reversed and remanded.*